## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

ALDO VERA, JR., as Personal Representative
of the Estate of Aldo Vera, Sr.,

        Plaintiff,

    v.

THE REPUBLIC OF CUBA,

        Defendant.

Case No. 12 Civ. 1596 (AKH)

## MEMORANDUM IN SUPPORT OF MOTION TO VACATE THE JUDGMENT FOR LACK OF SUBJECT MATTER JURISDICTION, TO ACCCOUNT FOR ALL FUNDS RECEIVED, AND TO DISGORGE

Intervenors, Alfredo Villoldo and Gustavo Villoldo, individually, and as Administrator, Executor, and Personal Representative of the Estate of Gustavo Villoldo Argilagos ("Intervenors" or "Villoldos"), hereby file this memorandum in support of their motion to vacate the judgment and strike it from the public records for lack of subject matter jurisdiction and to require Aldo Vera, Jr. to account for all funds received by the Estate and disgorge the same.

## INTRODUCTION

Intervenors submit that the Estate of Aldo Vera (the "Estate") cannot proceed to enforce its judgment because that judgment is void for lack of subject matter jurisdiction on two grounds: (1) Aldo Vera was a "terrorist"[1] who was killed a result of criminal activities and not by the Republic of Cuba;[2] and (2) Aldo Vera was not an American national as required by 28 U.S.C. §

---

[1] CIA Memorandum, declassified 6/17/1995, at p. 4, attached as Exhibit A. "Exhibit ___" refers to the corresponding exhibit annexed to the accompanying Declaration of Andrew C. Hall.
[2] FBI Report dated 12/8/1976, at p. 4, attached as Exhibit B.

{10225/00313354.1}

1605(a)(7).  Because each of these missing facts is essential to subject matter jurisdiction and the waiver of sovereign immunity, the Vera judgment is void and may not be enforced.

As discussed below, Aldo Vera was killed by the mafia in Puerto Rico after Vera's attempt to murder a mafia boss failed.  This has been confirmed by the FBI, the Puerto Rico police department, and certain media outlets that covered the killing.  The claim that Vera was murdered by Cuban agents is untrue.

Vera was not a victim of terrorism.  Rather, during his lifetime, Vera was a terrorist who tortured, maimed, and killed over 80 innocent victims in different attacks after leaving Cuba. Despite the fact that Aldo Vera maimed, tortured and killed innocent victims during his lifetime, Plaintiff, the Estate of Aldo Vera (the "Estate"), in a bizarre, outrageous and brazen misuse of legal process, obtained a judgment of over $95 million based on the false allegation that Aldo Vera was assassinated by the Cuban government.  The Estate has already collected at least $700,000 from banks within this district in partial satisfaction of that judgment.  However, Aldo Vera was not assassinated by the Republic of Cuba.  As demonstrated, Aldo Vera was a terrorist and a mass murderer who was killed in Puerto Rico by mafia criminals and not by the Republic of Cuba.  Moreover, Aldo Vera was not an American national as required under 28 U.S.C. § 1605(a)(7).

By this motion, the Villoldos seek to declare the judgment as void and require to Estate to provide a full accounting of all funds the Estate received on the basis of its void judgment, and disgorge the wrongfully received funds to the Villoldos.

# BACKGROUND[3]

I.    **Aldo Vera was Chief of the Cuban Police Division Responsible for Mass Abduction, Torture and Assassination.**

Prior to the Cuban revolution, Aldo Vera was in prison in Cuba.  *See* FBI Report dated 8/16/74, at pp. S, T-U, attached as Exhibit C.  He had been convicted of making bombs and attempting to bomb political targets in the Fulgencio Batista administration.  *Id.*

Fidel Castro seized power on January 1, 1959 in a violent overthrow of the Batista administration.  Castro released Aldo Vera from prison in 1959 and appointed him Chief of the Department of Investigation of the Cuban Police.  *Id.*  This Department was the "main intelligence organ of the Cuban Nat'l Police."  *See* Exhibit A, CIA Document, declassified 6/17/1995, at p. 5.  Vera caused this Department to detain former Batista political figures, military personnel, wealthy Cuban citizens, and Cuban citizens suspected of ties to the United States.  *See* Declaration of Jorge Salazar-Carillo, attached as Exhibit D.  In the weeks following the revolution, many of these Cuban citizens were crowded in small jail cells and, after mock trials, taken to La Cabana to be executed.  *Id.*  La Cabana was the notorious site led by Che Guevara at which Guevara would supervise executions of these Cuban citizens by firing squad.  *Id.*  Intervenors, Gustavo Villoldo and Alfredo Villoldo, were detained by Vera's Department of Investigation.  Gustavo was beaten, suffocated and tortured at the hands of Vera's police agents.  Gustavo Villoldo narrowly avoided execution after his mother courageously withstood physical abuse at the prison and refused to leave until the guards released her son.

---

[3] The FBI and CIA documents cited herein are declassified and publicly available.  Many of these documents were obtained from The National Security Archive at The George Washington University, available at http://www.gwu.edu/~nsarchiv/index.html.  Other documents were obtained from the Mary Ferrell Foundation website (www.maryferrell.org).  The Mary Ferrell Foundation is a non-profit group dedicated to providing a national historical resource.  The website contains a database of over 1.2 million pages of documents, government reports, books, essays and other government documents.

II.     **Aldo Vera Left Cuba and Became a Notorious Terrorist-for-Hire and Mass Murderer.**

In the early 1960s, Aldo Vera left Cuba.  He then began his career as a violent and merciless terrorist-for-hire, indiscriminately bombing and killing at least 80 documented innocent victims, and likely dozens more.  Vera claimed he left Cuba when he became aware of Fidel Castro's leanings toward communism.  *See* Memorandum from the Office of the Assistant Secretary of Defense, dated 2/20/1962, attached as Exhibit E.  However, officers within the United States Defense Department believed Aldo Vera to be a possible double agent working for Fidel Castro.  *Id.* (See Note of Col. Patchell, ¶ 7 of Memorandum, attached as Exhibit E).

Upon leaving Cuba, Aldo Vera joined an organization called AC (Accion Cubana).  *See* Exhibit A, FBI Report, dated 12/8/1976, at p. 5.  The FBI deemed AC a "Cuban exile terrorist organization."  *Id.*  The CIA labeled AC a "Cuban exile extremist group."  *See* CIA document dated 6/22/1976, attached as Exhibit F.  Orlando Bosch was the leader of AC.  Exhibit A, FBI Report, dated 12/8/1976, at p. 5.  Bosch was a notorious terrorist and mass murderer.  At the time, Bosch was a federal fugitive with a record of arrests for possession of arms, extortion, and transportation of explosives.  *Id.*  Aldo Vera was second in charge of AC under Orlando Bosch. *Id.*  Aldo Vera also led his own Cuban exile extremist organization, M-7.  Exhibit C, FBI Report dated 8/16/1974, at pp. B-C.  M-7 was considered a "terrorist group" by the FBI.  *Id.*  The headquarters of M-7 was in San Juan, Puerto Rico.  *Id.*

As leader of M-7, Vera was responsible for bombings, including the bombing of the Venezuelan Consulate in Puerto Rico in August 1974.  *Id.*  Aldo Vera received financial aid for his terrorist acts from mafia figures in the United States.  The CIA reported that one of the most powerful and murderous organized crime bosses, Santo Trafficante, Jr., personally "gave

financial aid for arms and ammunition to Aldo Vera." *See* CIA Memorandum dated 4/7/1977, attached as Exhibit G.

**III.  Aldo Vera Assisted in the Assassination of Orlando Letelier and the Wife of his American Assistant in Washington, D.C.**

In July 1976, by Aldo Vera's own admission, he helped plan a terrorist attack that occurred in the United States on Orlando Letelier and Ronni Moffitt. *See* FBI Document dated 9/16/1983, attached as Exhibit H.  Orlando Letelier was an accomplished Chilean economist, politician and diplomat. *See* Declaration of John Dinges, attached as Exhibit I.[4]  Letelier was Chile's Minister of Foreign Affairs, Interior and Defense prior to the 1973 *coup d'etat* by which Augusto Pinochet assumed power as dictator of Chile. *Id.*  Following the overthrow of the prior government, Minister Letelier was arrested and tortured for 12 months by the Pinochet government. *Id.*  After his release, Letelier sought and received political asylum in the United States.  Former Minister Letelier accepted academic positions in Washington, D.C. at the Institute for Policy Studies and American University. *Id.*  He became a leading voice against the oppressive and corrupt Augusto Pinochet regime in Chile. *Id.*

The Chilean secret police (National Intelligence Directorate or DINA) arranged for the assassination of Letelier in the United States and hired Aldo Vera and other Cuban exiles to assist with orchestrating, planning, and executing the assassination of Letelier. *Id.*  Aldo Vera admitted to the FBI that he helped plan this assassination.  Exhibit H, FBI Document dated 9/16/1983.  Vera attended a meeting in June of 1976 for that purpose. *Id.*  Aldo Vera identified several others who were at the meeting, including Michael Townley and Jose Suarez. *Id.*  Michael Townley was convicted for the bombing and confessed to hiring Cuban exiles to assist

---

[4] John Dinges is a Professor of Journalism at Columbia University Graduate School of Journalism.  He has published five books, including *Assassination on Embassy Row*, which chronicles the assassination of Orlando Letelier.

in the bombing. Exhibit I, Declaration of John Dinges. Jose Suarez was the man who remotely detonated the bomb. *Id.*

Chilean DINA agents intended for the assassination to be a public act of terrorism on U.S. soil. *Id.* Cuban exiles and DINA agents planned to place a car bomb on Letelier's vehicle and detonate it while Letelier was driving on a public street in Washington, D.C. *Id.* The assassination occurred on September 21, 1976. *Id.* Orlando Letelier was providing a ride to his research assistant Michael Moffitt and his wife, Ronni Moffitt, after their car had broken down. *Id.* As Orlando Letelier, Michael Moffitt and Ronni Moffitt drove onto Sheridan Circle on Embassy Row, Jose Suarez remotely detonated the car bomb. *Id.* The blast killed Orlando Letelier and Ronni Moffitt. *Id.* Ronni's husband survived. *Id.* A memorial to Letelier and Moffitt remains on Sheridan Circle. *Id.*

## IV.   Aldo Vera Bombed Cubana Flight 455 Killing 78 Innocent Victims.

On October 6, 1976, two bombs were placed on a Cuban airliner, Cubana flight 455. The bombs were detonated 11 minutes after takeoff, as the airliner reached an altitude of 18,000 feet. The explosion in mid-air sent the plane into a rapid descent as the pilots tried unsuccessfully to return to the airport for an emergency landing. The airplane crashed into the Atlantic Ocean, killing all 73 passengers and 5 crew on board. Twenty-four of the innocent victims killed in the bombing were members of the Cuban national fencing team. Many of the victims were teenagers.

Aldo Vera admitted to the FBI that he helped plan the bombing of Cubana flight 455. Exhibit H, 9/16/1983 FBI Document. The CIA independently concluded that Vera actively planned and executed the bombing of this aircraft. *See* Exhibit A, CIA Document, declassified

6/17/1995, at p. 5 ("The recent operation against the Cubana plane was mounted by Posada assisted by Aldo Vera.").[5]

**V.      Aldo Vera was Hired to Kill a Mafia Boss in Puerto Rico and Vera Maimed Two Police Officers in the Failed Assassination Attempt.  Aldo Vera was Killed in Puerto Rico in Connection with this Attempted Assassination.**

Aldo Vera was killed in Puerto Rico in connection with an attempted mafia assassination a few weeks after Cubana flight 455 was bombed.  Aldo Vera was hired by two mafia figures in Puerto Rico, brothers Julio and Frank Del Ray, to kill a rival mafia boss, Ramon A. Ramos Lozada.  *See* Declaration of Juan Oliveras, attached as Exhibit K.[6]  The Del Ray brothers and Mr. Ramos were in a dispute over territory for an "illicit motel business."  *Id*; *The Miami Herald*, dated 10/28/1976, at p. 10-B, attached as Exhibit L.  Puerto Rican police concluded that Aldo Vera planted a bomb in Mr. Ramos's car.  Exhibit K, Declaration of Juan Oliveras.[7]

On October 23, 1976, as two police officers were attempting to defuse the bomb planted by Vera, the bomb exploded and severely injured the officers.  *Id.*  The officers, Angel Candelaria and Manuel Caban Soto, lost both their arms as a result.  *Id.*  After the bombing, Manuel Caban Soto went to law school and is currently a judge in Puerto Rico.  *Id.*

---

[5] Shortly after the Letelier assassination in Washington, D.C., Orlando Bosch, Vera's terrorist compatriot, was quoted as saying: "Now that our organization has come out of the Letelier job looking good, we are going to try something else."  *See* Intelligence Information Cable dated 10/14/1976, attached as Exhibit J.  Another militant Cuban exile, Luis Posada, was overheard saying: "We are going to hit a Cuban airplane."  *Id.*  Luis Posada was charged with aggravated homicide and treason by a Venezuelan court for the bombing of Cubana flight 455.

[6] Juan Oliveras is a former Puerto Rico police officer and is currently a private investigator in Puerto Rico.  In connection with his Declaration, he interviewed the police officers who investigated the bombing and subsequent killing of Aldo Vera.  Mr. Oliveras also interviewed the Puerto Rico sitting judge who was formerly the police officer who lost his arms while attempting to defuse the bomb planted by Aldo Vera.

[7] Intervenors have subpoenaed the Puerto Rican Police Department for all records regarding this bombing and will be receiving the entire police file shortly.  Intervenors will then supplement this motion with additional evidence.

Two days after Vera's attempted assassination of the mob boss in Puerto Rico, Aldo Vera was shot and killed on the streets of Puerto Rico. *See* Exhibit B, FBI Report, dated 12/8/1976. According to the FBI, "police advised the murder was related to criminal activities *rather than Cuban exile political matters*." *Id.* (emphasis added). Intervenors have learned from reliable sources that the FBI investigated the murder of Aldo Vera for the specific purpose of determining whether the Republic of Cuba was involved in the murder.[8] The FBI concluded that Cuba had no involvement in the murder and, as a result, left the investigation to the Puerto Rico Police Department. The Puerto Rican Police Department concluded that Aldo Vera was killed as a result of the attempted killing by Aldo Vera of mafia boss Ramon A. Ramos Lozada. *See* Exhibit K, Declaration of Juan Oliveras.[9] This conclusion was confirmed by *The Miami Herald* on October 28, 1976:

> The slaying of anti-Castro activist Aldo Vera Serafin in Puerto Rico Monday night was the result of an underworld struggle for illicit motel business *and not political activity*, Puerto Rican police sources said Wednesday.

*The Miami Herald*, dated 10/28/1976, at p. 10-B, attached as Exhibit L (emphasis added).

## VI.    Pending Discovery Relating to Terrorist Acts and Killing of Aldo Vera

In addition to further review of publicly available FBI and CIA documents relating to Aldo Vera, Intervenors have several subpoenas pending for records regarding the death of Aldo Vera, including subpoenas to the FBI and the Puerto Rico Police Department, upcoming depositions in Puerto Rico of police investigators involved in the investigation of Vera's killing

---

[8] Intervenors have recently subpoenaed the FBI for its records regarding this investigation and should be receiving the entire FBI shortly. Intervenors will then supplement this motion with additional evidence.

[9] Intervenors have also subpoenaed the Puerto Rican Police Department for all records regarding the murder of Aldo Vera and will be receiving the entire police file shortly. Intervenors will then supplement this motion with additional evidence.

and the officer/judge maimed in the bombing, and an open FOIA request to the National Security Archive for all records pertaining to Aldo Vera.  Intervenors will also be interviewing a number of Puerto Rican citizens with personal knowledge of the killing of Aldo Vera.

Following this discovery, Intervenors will be submitting a supplemental memorandum in support of this motion which will establish that Aldo Vera was not assassinated by the Republic of Cuba.

## VII.    Aldo Vera was Not an American Citizen Nor a National of the United States.

Aldo Vera was a citizen of the Republic of Cuba residing in Puerto Rico at the time of his death.  As discussed below, Aldo Vera was not a national of the United States.  Neither the Florida Complaint nor the New York Complaint alleges Vera was an American national.  The only specific findings made by the Florida state court that bear any relation to this matter were that, after Vera left Cuba, he lived in Miami, Florida and San Juan, Puerto Rico, and was killed "while living in Puerto Rico."  The Court has made no findings of fact relevant to the issue of Aldo Vera's status as a national.  This fact eliminates jurisdiction under the FSIA.

## ARGUMENT

## I.    Vera's State Court Judgment is Subject to Collateral Attack for Lack of Subject Matter Jurisdiction.

"Parties seeking to challenge a federal court's reliance on an invalid state-court judgment may properly frame their argument as a collateral attack upon the prior decision." *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 299 (6th Cir. 2005) (citing *Kalb v. Feuerstein*, 308 U.S. 433, 438, 60 S.Ct. 343, 84 L.Ed. 370 (1940) (holding that where a state court had ruled without jurisdiction, its decision was "void, and subject to collateral attack" in the subsequent proceeding); *Hosp. Underwriting Group, Inc. v. Summit Health, Ltd.*, 63 F.3d 486, 495 (6th Cir.1995). (holding that a state-court judgment could be found "void" and "collaterally attacked

... if the court lacked subject matter jurisdiction over the case, personal jurisdiction over the parties or jurisdiction to render the particular judgment given, or ... the judgment was the product of extrinsic fraud"); *see also Gage v. Gage*, 89 F. Supp. 987, 989 (D.D.C 1950) ("[A] decree by a court not having jurisdiction of the subject matter or the parties does not come under the protection of the full faith and credit clause.").

## II.     Subject Matter Jurisdiction May Be Raised at Any Time.

"Issues relating to subject matter jurisdiction may be raised at any time, even on appeal, and even by the court *sua sponte*.  If a court perceives at any stage of the proceedings that it lacks subject matter jurisdiction, then it must take proper notice of the defect by dismissing the action." *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir. 2008) (citing *Liberty Mut. Ins. Co. v. Wetzel*, 424 U.S. 737, 740, (1976); Fed. Rule Civ. Proc. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.")); *see also Kontrick v. Ryan*, 540 U.S. 443, 455 (2004) ("A litigant generally may raise a court's lack of subject-matter jurisdiction at any time in the same civil action, even initially at the highest appellate instance.") (citing *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382, (1884) (challenge to a federal court's subject-matter jurisdiction may be made at any stage of the proceedings, and the court should raise the question sua sponte); *Capron v. Van Noorden*, 2 Cranch 126, 127 (1804) (judgment loser successfully raised lack of diversity jurisdiction for the first time before the Supreme Court); *see also Wilton Miwok Rancheria v. Salazar*, 2010 WL 693420 at *4 (N.D. Cal. Feb. 23, 2010) (holding that the Court had a duty to consider whether it had subject matter jurisdiction, when raised by proposed intervening parties).

The Defendant, Republic of Cuba's, failure to appear and contest subject matter jurisdiction does not bar that argument from being asserted later in the case. *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.*, 109 F.3d 105, 107 (2d Cir. 1997) ("'[T]he failure of the parties to contest the district court's authority to hear a case 'does not act to confer [federal] jurisdiction ... since a challenge to subject matter jurisdiction cannot be waived and may be raised [either by motion or] *sua sponte*' at any time.") (citing *United Food & Commercial Workers Union, Local 919 v. CenterMark Properties*, 30 F.3d 298, 301 (2d Cir.1994) (quoting *Alliance of Am. Insurers v. Cuomo*, 854 F.2d 591, 605 (2d Cir.1988)).

## III.   The Florida State Court Judgment is Void for Lack of Subject Matter Jurisdiction.

The Republic of Cuba is a sovereign state, provided with immunity from suit in the courts of the United States by the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1332, 1391(f), 1441(d), and 1602-1611 ("FSIA"). *See* 28 U.S.C. § 1604.  As such, for a court to have subject matter jurisdiction to hear a claim against the Republic of Cuba, the claim must qualify for one of the statutory exceptions to sovereign immunity described in the FSIA. *Jerez v. Republic of Cuba*, 777 F. Supp. 2d 6, 18 (D.D.C. 2011) ("[A]n exception under the FSIA must be applied in every action involving a foreign sovereign defendant.").

In the Florida state court action, the Vera Estate alleged that its claim against Cuba qualified under the terrorism exception to foreign sovereign immunity, 28 U.S.C. § 1605(a)(7) (repealed).  This section, since repealed, provided, in pertinent part:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of . . . extrajudicial killing . . . if such act . . . *is engaged in by an official, employee, or agent of such foreign* state while acting within the scope of his or her office,

employment, or agency, except that the court shall decline to hear a claim under this paragraph . . .

(B) if . . .

      (ii) *neither the claimant nor the victim was a national of the United States* (as that term is defined in section 101(a)(22) of the Immigration and Nationality Act) when the act upon which the claim is based occurred.

28 U.S.C. § 1605(a)(7) (repealed) (emphasis added). However, as described herein, the Vera Estate's claim did not qualify under § 1605(a)(7) exception to sovereign immunity for two reasons: (1) Aldo Vera was not killed by the Republic of Cuba; and (2) neither Aldo Vera nor Vera's Estate was a national of the United States when the act upon which the claim is based occurred. As a result, the Florida court's judgment against Cuba is void.

**A.    Aldo Vera Was Not Killed By The Republic of Cuba.**

In order to have a claim against the Republic of Cuba for an extrajudicial killing, the Republic of Cuba must have committed the extrajudicial killing. 28 U.S.C. § 1605(a)(7) (repealed). The FBI and the Puerto Rico Police Department concluded that Aldo Vera was not killed by the Republic of Cuba. In fact, the FBI investigated Vera's murder for the specific purpose of determining whether Cuba was involved, and found no such involvement. The Puerto Rico Police Department then concluded that Aldo Vera was killed in connection with his attempt to murder a mafia boss two days earlier. *See* Exhibit K, Declaration of Juan Oliveras. Both the FBI and *The Miami Herald* subsequently confirmed the findings of the Puerto Rico Police Department. *See* Exhibit B, FBI Report dated 12/8/1976, at p. 4 ("[H]e was shot and killed in San Juan where police advised the murder was related to criminal activities rather than Cuban exile political matters."); Exhibit L, *The Miami Herald*, dated 10/28/1976, at p. 10-B ("The slaying . . . was the result of an underworld struggle . . . and not political activity.").

In the Florida state court, Vera's Estate alleged, falsely, that Vera was killed by the Republic of Cuba.  The underlying file from Vera's state court action has been destroyed, and so Intervenors cannot determine if any evidence was submitted in support of the Estate's false allegation that Vera was killed by Cuban agents.  Nevertheless, any information would directly contradict the conclusions made by both the federal and Puerto Rican authorities responsible for investigating the killing.[10]

### B.   Neither Aldo Vera Nor the Claimant Were Nationals of the United States.

Section 1605(a)(7)(B)(ii) states that a court does not have subject matter jurisdiction to hear a claim pursuant to the terrorism exception to foreign sovereign immunity, § 1605(a)(7), if "neither the claimant not the victim was a national of the United States (as that term is defined in section 101(a)(22) of the Immigration and Nationality Act) when the act upon which the claim is based occurred."  In this case, the victim, Aldo Vera, Sr., and the claimant, the Estate of Aldo Vera, Sr., are the same, and neither was a national of the United States at the time Aldo Vera, Sr. was killed.[11]

The term "national of the United States" is defined in § 101(a)(22) of the Immigration and Nationality Act, 8 U.S.C. § 1102(a)(22), as follows:

---

[10] However, even if the Republic of Cuba had assassinated Aldo Vera (it did not), the Villoldos submit that this would not be considered an extrajudicial killing.  Aldo Vera was responsible for the mass murder of Cuban citizens and posed an immediate and continuing threat to the Republic of Cuba and its citizens.  The definition of extrajudicial killing specifically excludes "any such killing that, under international law, is lawfully carried out under the authority of a foreign nation." 28 U.S.C. § 1350, note; *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 150 (D.D.C. 2011).

[11] This argument, and others, were raised in Intervenors' Opposition to Plaintiff's Turnover Motion Against Commerzbank AG and All Other Pending Turnover Motions, and to Vacate All Prior Turnover Orders.  [Dkt. No. 156.]  Intervenors expressly incorporate all arguments raised in that Opposition in this Motion.

> The term "national of the United States" means (A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States.

The Second Circuit has held that, under § 1102(a)(22), "a person who, though not a citizen of the United States, that owes permanent allegiance to the United States" is a person that has statutorily qualified to be a national of the United States at birth, under another subsection of the Immigration and Nationality Act. *Ajlani v. Chertoff*, 545 F.3d 229, 234 (2d Cir. 2008) (citing *Marquez-Almanzar v. I.N.S.*, 418 F.3d 210, 218 (2d Cir. 2005)).

The victim in this action, Aldo Vera, Sr. was a citizen of the Republic of Cuba and resided in Puerto Rico at the time of his death. Aldo Vera, Sr. was not a national of the United States and neither the Florida Complaint nor the New York Complaint allege him to be one. Moreover, there has been no finding in either the Florida Judgment or the Judgment of this Court that Aldo Vera, Sr. was a national of the United States. Aldo Vera was neither a citizen of the United States, nor statutorily qualified to be a national of the United States at birth. Pursuant to Second Circuit precedent, Aldo Vera, Sr. was not a national of the United States. *Ajlani*, 545 F.3d at 234.[12]

The claimant in this action is the same as the victim. The Estate of Aldo Vera, Sr. was not a national of the United States at the time of Aldo Vera's death. The Estate is neither a "citizen" nor a "person" and therefore it cannot qualify as a national under § 101(a)(22) of the Immigration and Nationality Act. Moreover, the Estate did not exist at the time of Vera's death. To the extent the Estate has claimed that Aldo Vera, Jr. is the claimant, the Estate is incorrect. Aldo Vera, Jr. appears in this action only in his capacity as personal representative of the Vera

---

[12] In response, the Estate cites the rule in different circuits, and then explains that its analysis has no relevance to this Court because the Second Circuit interprets the rule differently. [Dkt. No. 169 at p. 6.]

Estate. The Estate's interpretation would allow the estate of any non-national to appoint a national of the United States as its personal representative for purposes of bringing a claim under FSIA. *See* Fla. Stat. § 733.302 ("[A]ny person who is sui juris and is a resident of Florida . . . is qualified to act as personal representative in Florida.").

**IV.   This Court Cannot Give Full Faith and Credit to a Void Judgment and This Court's Judgment Should be Vacated Pursuant to Rule 60(b).**

On August 17, 2012, this Court entered a judgment giving full faith and credit to the Florida state court judgment and awarding the Vera Estate $49,346,713.22 against the Republic of Cuba.[13] [Dkt. No. 12.] However, as demonstrated herein, the Florida state court judgment is void for lack of subject matter jurisdiction. This Court cannot give full faith and credit to a judgment rendered by a court that lacked appropriate jurisdiction. *See Underwriters Nat. Assur. Co. v. N. Carolina Life & Acc. & Health Ins. Guar. Ass'n*, 455 U.S. 691, 704 (1982) ("[A] judgment of a court in one State is conclusive upon the merits in a court in another State only if the court in the first State had power to pass on the merits—had jurisdiction, that is, to render the judgment.") (citations omitted). Accordingly, the Court should vacate the judgment entered on August 17, 2012 giving full faith and credit to a judgment entered by a Florida state court which lacked subject matter jurisdiction.

Pursuant to Rule 60(b)(4), the Court should vacate a final judgment that is void. Fed. R. Civ. P. 60(b)(4); Covington Industries, Inc. v. Resintex A.G., 629 F.2d 730, 733 n.3 (2d Cir. 1980) ("Subsection four [of Rule 60(b)] is unique, however, because relief is not discretionary and a meritorious defense is not necessary."). Moreover, a void judgment may be challenged

---

[13] The Vera Estate did not seek full faith and credit for the punitive damages portion of its over $95 million Florida state court judgment.

"not only directly but also by collateral attack in a proceeding in any court where that judgment's validity comes in issue." *Graciette v. Star Guidance, Inc.*, 66 F.R.D. 424, 425 (S.D.N.Y. 1975).

## V.     Intervenors' Challenges are Not Barred by Res Judicata.

The findings of fact or law made by the Florida court do not preclude any of the challenges raised by Intervenors in this motion. "The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'" *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). Claim preclusion bars successive litigation of the same claim, and issue preclusion bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). However, neither claim preclusion nor issue preclusion bar a non-party to the original action from raising matters that would otherwise be considered precluded by res judicata. *Id*; *see also Baker v. General Motors Corp.*, 522 U.S. 222, 237 n. 11 (1998) ("In no event. . . can issue preclusion be invoked against one who did not participate in the prior adjudication."); *Durfee v. Duke*, 375 U.S. 106, 115 (1963) (non-parties cannot be bound by decisions made in prior litigation "with respect to any controversy they might have, now or in the future . . . .").

## VI.     Intervenors are Entitled to Disgorge All Funds Received by the Vera Estate in Connection with Its Void Judgment.

"A void judgment is a legal nullity." *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 270 (2010). In reliance on the Estate's void judgment against the Republic of Cuba, the Estate has collected at least $700,000 from garnishees within this district. The Villoldos respectfully request that the Court require the Estate to provide a full accounting of all sums it received in attempting to enforce its void judgment.

The Villoldos hold a valid judgment against the Republic of Cuba in excess of $2.9 billion and the Estate has deprived the Villoldos from these funds which should be used towards satisfaction of the Villoldos' judgment.   Accordingly, the Villoldos request that the Court disgorge the Estate of all sums it received and award those funds to the Villoldos.

## CONCLUSION

For the foregoing reasons, the Intervenors respectfully request that the Court vacate the judgment entered in favor of the Vera Estate from the public records for lack of subject matter jurisdiction, require Aldo Vera, Jr., as personal representative of the Estate, to account for all funds received by the Estate, and disgorge those funds and award them to the Intervenors, and for such other relief that the Court deems just and reasonable.

Dated:  June 18, 2013

/s Andrew C. Hall
Andrew C. Hall, Esq.*
Brandon R. Levitt (BL1028)
HALL, LAMB AND HALL P.A.
2665 South Bayshore Drive, PH1
Miami, Florida 33133
Tel.: (305) 374-5030
Fax: (305) 374-5033
* admitted *pro hac vice*

and

Edward H. Rosenthal, Esq.
Beth I. Goldman, Esq.
FRANKFURT KURNIT KLEIN & SELZ, P.C.
488 Madison Avenue, 10th Floor
New York, New York 10022
Tel.:  (212) 980-0120
Fax:  (212) 593-9175

*Attorneys for Alfredo Villoldo, individually, and Gustavo E. Villoldo, individually, and as Administrator, Executor, and Personal Representative of the Estate of Gustavo Villoldo Argilagos*

{10225/00313354.1}                          17

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the forgoing was electronically filed with the Court via the CM/ECF system and was delivered via U.S. mail on this 18th day of June, 2013 to: Bruno Eduardo Rodríguez Parrilla, Minister of Foreign Affairs, Cuban Interests Section, 2630 16th Street, N.W., Washington, D.C. 20009.

_____ /s/ Brandon R. Levitt _____
Brandon R. Levitt
