# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

ALDO VERA, JR., as Personal Representative
of the Estate of Aldo Vera, Sr.,

                Plaintiff,

    v.

THE REPUBLIC OF CUBA,

                Defendant.

Case No. 12-CV-01596
(AKH)

---

ALDO VERA, JR., as Personal Representative
of the Estate of Aldo Vera, Sr.; and

JEANETTE FULLER HAUSLER, and WILLIAM FULLER as
court-appointed co-representatives of the ESTATE OF ROBERT
OTIS FULLER, deceased, on behalf of all beneficiaries of the
Estate and the ESTATE OF ROBERT OTIS FULLER; and

ALFREDO VILLOLDO, individually, and
GUSTAVO E. VILLOLDO, individually and as Administrator,
Executor, and Personal Representative of the ESTATE OF
GUSTAVO VILLOLDO ARGILAGOS,

                Petitioners,

    v.

BANCO BILBAO VIZCAYA ARGENTARIA (S.A.); BANK OF
AMERICA N.A.; BANK OF NEW YORK MELLON;
BARCLAY'S BANK PLC; CITIBANK N.A.; CREDIT SUISSE
AG, NEW YORK BRANCH; DEUTSCHE BANK TRUST
COMPANY AMERICAS; HSBC BANK (HSBC BANK USA,
N.A.); INTESA SANPAOLO S.P.A.; JP MORGAN CHASE
BANK, N.A.; RBS CITIZENS, N.A.; ROYAL BANK OF
CANADA; SOCIETE GENERALE; UBS AG; WELLS FARGO
BANK, NA; BROWN BROTHERS HARRIMAN & CO.;
MERCANTIL COMMERCEBANK, N.A.; STANDARD
CHARTERED BANK; AND BANCO SANTANDER, S.A.,

                Respondents/Garnishees.

**PETITIONERS'
MEMORANDUM OF
LAW IN OPPOSITION
TO GARNISHEE
BANKS' MOTION FOR
RECONSIDERATION
AND STAY**

# Table of Contents

PRELIMINARY STATEMENT    1

ARGUMENT    2

I.    THE GARNISHEE BANKS LACK STANDING TO RAISE ANY DEFENSE    2

II.    THE GARNISHEE BANKS HAVE FAILED TO SATISFY THE REQUIREMENTS FOR RECONSIDERATION    3

III.    GARNISHEE BANKS ARE BOUND BY THE CONSENT DECREE TO WHICH THEY AGREED AND IT SHOULD BE ENFORCED ACCORDNG TO ITS TERMS    4

IV.    EVEN ASSUMING GARNISHEE BANKS WERE NOT BOUND BY THE TERMS OF THEIR AGREEMENT, *CALDERON-CARDONA* AND *HAUSLER* DO NOT COMPEL THE RESULT THE BANKS CONTEND    7

V.    GARNISHEE BANKS THAT HAVE VIOLATED OFAC SANCTIONS CANNOT TAKE ADVANTAGE OF *CALDERON-CARDONA* AND *HAUSLER* GIVEN THEIR CONCEDED CONNECTION TO CUBA    10

     A.    Garnishee HSBC Bank USA, N.A.    12

     B.    Garnishee Barclays Bank PLC    13

     C.    Garnishee JPMorgan Chase Bank, N.A.    14

VI.    THE GARNISHEE BANKS ARE NOT ENTITLED TO A STAY, WHICH IN THIS CASE IS NOT APPROPRIATE    15

     A.    The Garnishee Banks Have Not Satisfied the Standard for a Stay    15

     B.    Garnishee Banks Are Required to Post a Bond In Any Event    16

CONCLUSION    18

WDC 373073870v5

# PRELIMINARY STATEMENT

The Garnishee Banks ask the Court to reconsider its March 17, 2015 Order and Judgment for Turnover of Specified Uncontested Phase I Accounts (the "Order") on the basis that the Second Circuit's decisions in *Calderon-Cardona* and *Hausler* were overlooked by the Court and those decisions relieve the Garnishee Banks from the consent decree to which they previously stipulated. As an initial matter, the Garnishee Banks have no standing to seek such relief, as the Order granted them a full discharge as stakeholders. They face no potential liability and cannot raise arguments on behalf of entities that were notified by an agreed process, and chose not to appear in this case. Nevertheless, the motion fails as a matter of law. The Court did not overlook the Second Circuit's decisions. In fact, the Court held a status conference on November 5, 2014 for the specific purpose of hearing argument concerning how those decisions impact this proceeding. The Order followed the Garnishee Banks' articulation of the same arguments they raise now on this motion.

Moreover, the Order itself simply enforces the terms of the consent decree stipulated to by the Garnishee Banks after negotiations between the parties. Those negotiations included a full consideration of the *Calderon-Cardona* and *Hausler* appeals, pending at the time, and the Phase I Accounts were carved out for the very purpose of avoiding any potential impact those decisions could have on these proceedings. Even if the Garnishee Banks could now change the terms of that bargain and unwind a consent decree, the Second Circuit decisions hold that the N.Y. U.C.C. controls and applying the U.C.C. does not compel the result urged by the Garnishee Banks. Rather, as some of those banks argued in briefing in *Hausler*, the New York U.C.C. requires these blocked transactions to be unwound to the originator, who holds a claim for a

1

refund from the originating bank. Thus, all of the Phase I accounts can be turned over consistent with the Second Circuit's holding that New York law defines the property rights at issue.

As further discussed herein, the alleged lack of any connection between the Garnishee Banks and the sovereign debtor, Cuba, is belied by the recent revelation, as many of them have admitted, that they have engaged in long-term banking relationships with the Republic of Cuba and its agencies and instrumentalities in violation of U.S. sanctions. According to the charging documents and their admissions, these banks purposefully concealed their relationship with Cuba by removing references to Cuban entities in wire transfer details. These same banks cannot now rely on the decisions in *Calderon-Cardona* and *Hausler* to validate illegal conduct and avoid the bargain they reached with Petitioners and the Court.

Finally, the Garnishee Banks have not presented valid grounds for a stay, nor is a stay warranted given the current state of affairs with Cuba and the potential for Executive Branch action that could remove the funds that are the subject of this proceeding from the reach of adjudged victims of terrorism.

## ARGUMENT

### I. THE GARNISHEE BANKS LACK STANDING TO SEEK RECONSIDERATION OR STAY

Article III jurisdiction requires a live controversy at every stage of the litigation. *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975); *Honig v. Doe*, 484 U.S. 305, 307 (1988). The Turnover Order discharged the banks from any liability with regard to the accounts identified in the Order. The discharge removes any possible injury the banks could sustain arising from the turnover of the accounts. At this juncture, therefore, the banks lack standing to raise defenses to Petitioners' relief since they no longer have any personal injury traceable to turnover of the accounts. *See Daimler Chrysler v. Cuno*, 547 U.S. 332 (2006). Moreover, a litigant generally

2

lacks standing to advance the rights of others. *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166 (1972). Garnishee Banks may not do so here.

## II. THE GARNISHEE BANKS HAVE FAILED TO SATISFY THE REQUIREMENTS FOR RECONSIDERATION

"A court's reconsideration of a previous order 'is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.'" *WTC Captive Ins. Co. v. Liberty Mut. Fire Ins. Co.*, 537 F. Supp. 2d 619, 623-24 (S.D.N.Y.) *supplemented*, 549 F. Supp. 2d 555 (S.D.N.Y. 2008) (Hellerstein, J.) (*quoting In re Health Mgmt. Systems Inc. Sec. Litig.*, 113 F.Supp.2d 613, 614 (S.D.N.Y.2000) (internal quotation marks and citation omitted)). "On a motion for reconsideration [under Fed. R. Civ. P. 59(e)], the movant must demonstrate the existence of a 'matter [ ] or controlling decision' that the court originally overlooked." *Am. Civil Liberties Union v. Dep't of Def.*, 396 F. Supp. 2d 459, 460-61 (S.D.N.Y. 2005), *as amended* (Nov. 2, 2005) (Hellerstein, J.) (*quoting* Local Civil Rule 6.3) (bracketed material in original); *Bucurescu v. Union Chelsea Nat. Bank*, No. 98 CIV 5551 (AKH), 1999 WL 65033, at *1 (S.D.N.Y. Feb. 10, 1999) (Hellerstein, J.) ("[A]ppellants have failed to bring to my attention any matters that were overlooked in reaching my prior decision. Accordingly, the motion to reargue is denied."). "The grounds for reconsideration are narrow." *In re Sept. 11 Litig.*, No. 21 MC 101 (AKH), 2009 WL 1181057, at *2 (S.D.N.Y. Apr. 30, 2009) (Hellerstein, J.) (*citing Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir.1995) ("The standards for granting such a motion are strict.")). A motion for reconsideration is not an opportunity to reargue issues. *See In re Houbigant, Inc.*, 914 F.Supp. 997, 1001 (S.D.N.Y.1996).

Citing to *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992), Garnishee Banks contend further that there has been an "intervening change of controlling law." But the procedural history of this matter demonstrates the Court has not overlooked

controlling law. The Garnishee Banks fail to take into account the fact that the Court issued its Order fully cognizant of the Second Circuit rulings in *Hausler* and the companion case *Calderon v. JP Morgan Chase, N.A.*, No. Civ. 12-75(L), which were decided months earlier. The decisions in these two cases, which were referenced in the Notice Protocol, were the very reason the Court held a hearing on November 5, 2014 (Doc. No. 731 at 3:2-10) (The Court: "I asked for this conference to review the numbers of motions before me and their status and to see what we should do following the recent decisions by the Second Circuit Court of Appeals in *Calderon Cardona v. Bank of New York Mellon* decided October 23, 2014, and *Hausler v. JPMorgan Chase*, decided October 27, 2014.").

In fact, at the November 5 hearing, the Garnishee Banks argued that there should be no turnover in view of those decisions and acknowledged that the Court was "very well aware" of the recent Second Circuit decisions in *Hausler* and *Calderon-Cardona*. (*See, e.g., id.* Tr. at 21:12-20; 26:15-22.) This history shows Garnishee Banks arguments which they repeat on this motion, were fully considered by the Court before it issued the Order. Thus, there is no intervening change in law or other aspect of the law that the Court overlooked that would provide a ground for reconsideration.

## III. GARNISHEE BANKS ARE BOUND BY THE CONSENT DECREE TO WHICH THEY AGREED AND IT SHOULD BE ENFORCED ACCORDING TO ITS TERMS

The Order of December 9, 2013 (as amended on March 26, 2014, ECF #457) constitutes a consent decree. A consent decree is defined as relief agreed to by the parties and entered by the court. *Benjamin v. Jacobson*, 172 F.3d 144, 157 (2d Cir. 1999). The United States Supreme Court described in *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971) the process leading to the entry of consent decrees:

4

Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.

The Second Circuit Court of Appeals has explained that consent decrees must be construed as contracts:

> Although consent decrees are judicial orders, they are also agreements between parties that "'should be construed basically as contracts.'" *United States v. International Bhd. of Teamsters*, 998 F.2d 1101, 1106 (2d Cir.1993) (quoting *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236–37, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975)).

*E.E.O.C. v. New York Times Co.*, 196 F.3d 72, 78 (2d Cir., 1999); *see also Artvale, Inc. v. Rugby Fabrics Corp.*, 303 F.2d 283, 284 (2d Cir.1962) (per curiam) ("The court is not entitled to expand or contract the agreement of the parties as set forth in the consent decree").

In this case, the consent decree detailed a process for ultimate relief where non-party claimants—not the Garnishee Banks which are mere stakeholders—would receive notice and could assert their claims. A federal court has an interest in orderly, expeditious proceedings, *Hutto v. Finney*, 437 U.S. 678, 696 (1978), and the consent decree advanced the Court's interest.

The consent decree provided, *inter alia*:

- The Garnishee Banks were required to identify[1] and serve all parties with an

---

[1] Garnishee Banks' statement that there were more intermediary banks they expect to identify acknowledges an intentional violation of the consent decree. The Garnishee Banks were required to identify such banks and furnish notice to them more than a year ago. In particular, the consent decree provides: "Within 34 days after filing of the First Amended Omnibus Petition, in respect of each Phase I Blocked Asset held by a Respondent Bank as to which that Respondent Bank does not intend to file an interpleader petition, the Respondent Bank shall deliver the

interest in the accounts with a Notice and the Petition for Turnover.

- Non-parties had until June 18, 2014 to submit a written objection to Petitioners' claim to the accounts.
- If non-party claimants failed to submit a written objection by the deadline, a default would be entered.
- The Garnishee Banks would be discharged from liability.

The Turnover Order of March 17, 2015 (ECF #718), which was a form the Garnishee Banks themselves presented to the Court (*see* Doc. Nos. 718 and 718-1), specifically found that the non-parties were served but failed to respond and were in default (Doc. No. 718 at p. 6-7). Consistent with the consent order, judgment was entered in favor of Petitioners and the Garnishee Banks were discharged.

In moving for reconsideration of the Turnover Order, the Garnishee Banks are attempting to change the terms they agreed to in the consent decree. Knowing the issues present in *Calderon* and *Hausler*, the bargain negotiated was that Phase I would proceed to adjudication and the blocked accounts awarded to the claiming parties in consideration for Phase II being stayed pending a final decision in *Calderon* and *Hausler*. There was no reservation for Phase I accounts based on the outcome of appeals in *Calderon* and *Hausler*. Now, after *Calderon* and *Hausler* have been decided by the Second Circuit, the Garnishee Banks wish to renegotiate with the Petitioners without any legal entitlement to do so. The Supreme Court addressed this situation in *United States v. Armour & Co., supra.*:

> This argument would have great force if addressed to a court that had the responsibility for formulating original relief in this case, after the factual and legal issues raised by the pleadings had been litigated. It might be a persuasive argument for modifying the original degree, after full litigation, on a claim that unforeseen circumstances now made additional relief desirable to prevent the

---

'Notice Documents' (as described below) to the originator (the "Originator") and to the originator's bank (the "Originator's Bank"), **as well as any preceding intermediary bank** (an "Intermediary Bank"), to the extent that such Respondent Bank has contact information for such Originator, the Originator's Bank or the Intermediary Bank." Doc. No. 368 at p. 4 (emphasis added).

6

evils aimed at by the original complaint. **Here, however, where we deal with the construction of an existing consent decree, such an argument is out of place.**

402 U.S. at 681 (emphasis added). In another case dealing with enforcement of a consent decree where changed circumstances were raised, the Supreme Court said:

> Wisely or unwisely, they submitted to these restraints upon the exercise of powers that would normally be theirs. They chose to renounce what they might otherwise have claimed, and the decree of a court confirmed the renunciation and placed it beyond recall.

*U.S. v. Swift & Co.*, 286 U.S. 106, 119 (1932).

"Few persons are in a better position to understand the meaning of a consent decree than the district judge who oversaw and approved it." *Berger v. Heckler*, 771 F.2d 1556, 1576 n. 32 (2d Cir.1985). Here, the Court which entered the consent decree entered the Turnover Order in accordance with its terms. The Motion for Reconsideration does not contend otherwise. Accordingly, the Motion must be denied.

## IV. EVEN ASSUMING GARNISHEE BANKS WERE NOT BOUND BY THE TERMS OF THEIR AGREEMENT, *CALDERON-CARDONA* AND *HAUSLER* DO NOT COMPEL THE RESULT THE BANKS CONTEND

Garnishee Banks contend their agreement—demonstrated by the Notice Protocol and stipulated form of turnover order—that in the absence of any claims after due notice the Phase I Accounts can be turned over to Petitioners, should be avoided by the rulings in *Calderon-Cardona* and *Hausler*. (Mov. Mem. at 6-12.) Specifically, the Banks argue that the Second Circuit rulings foreclose Petitioners from recovering funds in Blocked Accounts where the underlying transaction that the Banks have identified do not include a Cuban agency or instrumentality as being the direct counterparty to the intermediary bank. Thus, conclude the Banks, Petitioners have the burden to show their counterparties were Cuba or its agencies or instrumentalities. (Mov. Mem. at 11.)

7

The law is not as the Banks contend it is. To be sure, by the referenced decision, the Second Circuit held that New York U.C.C., not federal, Cuban or international, law define the underlying property rights. Slip Op. at 7 ("we must look to state law to define the 'rights the judgment debtor has in the property the [creditor] seeks to reach'"). However, the Banks fail to place this rule in context, including how they themselves understand the U.C.C. applies to the facts presented.

For example, many of the Garnishee Banks contended in *Hausler*, that under Article 4-A of the U.C.C., a blocking under CACRs equals a cancellation "by operation of law" where the "funds transfers failed." *See* Mem. of Law In Support of Motion to Dismiss Petition ("MTD") at 15, Doc. 54, Case 1:09-cv-10289-VM.[2] These Banks understand the New York U.C.C. to mean that the transaction is, therefore, unwound to the point of origin, *i.e.*, to the originator. (*Id.* at 16-17.) This means, according to these Banks, that the blocked funds are "subject to the originator's claim for a refund from that originating bank." (*Id.* at 17.) In other words, as expressly set forth in the statute: "The first sender in the funds transfer that issued an instruction requiring routing through that intermediary bank is subrogated to the right of the bank that paid the intermediary bank to refund as stated in subsection (4)." U.C.C. 4-A-402(5). These Garnishee Banks have cited to the practice of OFAC: "while it is possible that exceptions could be made in appropriate cases, we understand this it is the almost unvarying practice, which issuing specific licenses to unblock wire transfers, to return the funds to the originator or originating financial institution, a practice fully in keeping with Article 4-A." (MTD at 19 (emphasis added).)[3]

---

[2]     The Garnishee Banks taking this position were Bank of America, N.A., JP Morgan Chase Bank, N.A., The Royal Bank of Scotland, N.V. and UBS AG.

[3]     Garnishee Banks make a false statement that Petitioner in *Hausler* sought re-hearing for the Second Circuit to "adopt, at minimum, the standard espoused by the D.C. Circuit in *Heiser*, which held that the 'originator has a cognizable interest in the [blocked] funds and a judgment creditor of the originator may attach those funds." (Mov. Mem. at 10.) In fact, Petitioner in *Hausler* made no such argument in its Petition for re-hearing, making even more

8

With this backdrop for guidance as to how even the Garnishee Banks understood the New York U.C.C., the Turnover Order issued by this Court is entirely appropriate. In an unwound transaction resulting from a blocked EFT, the originator's claim for a refund from the originating bank suffices to permit execution on the Blocked Accounts at issue pursuant to TRIA. In any event, Petitioners alleged in their Omnibus Turnover Petition, and no claimant appeared to contest otherwise, that as to the Phase I Accounts, a Cuban agent or instrumentality was either the originator or originating bank] of the funds held in the blocked Phase I Accounts. (Doc. No. 423 at ¶¶ 37-39.) Such an uncontested allegation is sufficient for the grant of relief requested. *Weininger v. Castro*, 462 F. Supp. 2d 457, 495 (S.D.N.Y. 2006) (by virtue of Cuban agency's default and failure to respond, "all factual allegations in the complaint other than those related to damages are accepted as true").[4]

Even if the Court were to decide that *Hausler* and *Calderon-Cardona* must alter the outcome here (which the Court has already evidently determined they do not), it does not automatically mean the Phase I Accounts turnover relief must be denied. The Garnishee Banks' assertions about the status of their dealings with Cuba and its agencies and instrumentalities cannot and should not be taken at face value. Rather, as this Court has already ruled with respect to BBVA, the Garnishee Banks must provide a full accounting of their dealings with Cuba and its agencies and instrumentalities, through discovery, including their dealings off shore. Short of the full grant of the Phase I Turnover Order, the Court should order full discovery of the Banks in this regard.

---

specious the Garnishee Bank's speculation about what the Second Circuit had in mind when it denied the rehearing Petition.

[4] Given the Garnishee Banks' stipulation on procedure in the Notice Protocol (Doc. No. __ at _), for them now to take the position that Petitioners have a different burden of proof is unseemly. (Mov. Mem. at 12.)

9

V. **GARNISHEE BANKS THAT HAVE VIOLATED OFAC SANCTIONS CANNOT TAKE ADVANTAGE OF *CALDERON-CARDONA* AND *HAUSLER* GIVEN THEIR CONCEDED CONNECTION TO CUBA**

At the November 15, 2014 hearing regarding the impact of the Second Circuit's decisions in *Calderon-Cardona* and *Hausler*, counsel for one of the Garnishee Banks indicated to this Court that the Garnishee Banks have had no banking relationship with the Republic of Cuba in violation of U.S. sanctions during the preceding decades. (*See* Nov. 5, 2014 Hearing Transcript at p. 17, l. 1-8, attached as Exhibit A to the Declaration of Brandon Levitt dated April 7, 2014). Counsel's representation in regard to certain of the Garnishee Banks, including JPMorgan Chase Bank, N.A., which he named, is not accurate. As has been recently disclosed, Garnishee Banks, including HSBC, Barclays Bank PLC, and JPMorgan Chase Bank, N.A., did in fact maintain covert banking relationships with the Republic of Cuba and illicitly processed hundreds of millions of dollars in transactions for Cuba through the United States. As detailed in various consent decrees summarized below, these Garnishee Banks have been criminally and/or civilly prosecuted for engaging in schemes with the Republic of Cuba to evade U.S. sanctions by illicitly manipulating identifying information and fraudulently routing transactions to disguise Cuba as the true owner of the funds. Given this history, these Garnishee Banks cannot take advantage of the holdings in *Calderon-Cardona* and *Hausler* to avoid the consent decree and seek to legitimize transfers that were made to intermediary banks for the purposes of avoiding their connection to Cuba.

During the time period in which these Garnishee Banks were knowingly and intentionally engaged in illicitly processing transactions for Cuba, it is more likely than not that any transactions involving Cuba originated from their own banking relationships with Cuba and were blocked by those entities only as a result of their failure to implement their own anti-sanctions protocols. To the extent any of the SWIFT transactions presently at issue were failed attempts to

10

illicitly hide Cuba's identity by falsifying information and/or routing the transaction through intermediary banks to disguise the originator, prior to clearing through the Garnishees' New York branches or other U.S. banks, the involvement of these intermediary banks and any purported ownership interest they may claim should be disregarded as a fraud. *See MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Services Co.*, 910 F. Supp. 913, 934 (S.D.N.Y. 1995) ("In general, courts will look past the form of a transaction to its substance. 'Thus, an allegedly fraudulent conveyance must be evaluated in context; where a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications.'") (quoting *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir.1993)); *see also Molina v. Sovereign Camp, W.O.W.*, 6 F.R.D. 385, 398 (D. Neb. 1947) ("[I]t is a well-established rule both of law and equity that, under certain circumstances, 'when necessary to circumvent fraud, protect the rights of third persons, and accomplish justice,' courts 'will look through form to substance' ...") (quoting *See In re Clear Lake Beach Co.*, 12 F. Supp. 250, 253 (N.D. Cal. 1935)).

Under the laws of the United States, financial institutions are prohibited from participating in a financial transaction with a state sponsor of terrorism, including the Republic of Cuba. 31 C.F.R. § 515.201(a). Any funds identified by a financial institution that involves a state sponsor of terrorism, or any of its agencies or instrumentalities, must be immediately blocked and put into a separate blocked account. *See Hausler v. JP Morgan Chase Bank, N.A.*, 740 F. Supp. 2d 525, 527 (S.D.N.Y. 2010) ("Among other purposes, the CACRs seek to block transactions in which Cuba has "any interest of any nature whatsoever, direct or indirect.") (quoting 31 C.F.R. § 515.201(a)); *see also* 31 C.F.R. § 515.319; *see also* 31 U.S.C. § 5318(g) and (h). According to the recent admissions of some of these Banks, they violated these rules.

11

### A. Garnishee HSBC Bank USA, N.A.

The deferred prosecution agreement with HSBC shows the following. Commencing at the latest beginning in the mid-1990s and continuing through at least 2010, Garnishee Bank HSBC Bank USA, N.A. ("HSBC") recognized Cuba's desire to avoid having its transactions blocked by OFAC sanctions and to avoid detection by judgment creditors of Cuba. HSBC entered into an ongoing conspiracy with the Republic of Cuba through unlawful and illicit SWIFT wire transactions to facilitate Cuban transactions through U.S. banks. The object of the conspiracy was (a) to conceal that the funds being transferred in "stripped" transactions were the true property of Cuban agencies and instrumentalities, (b) to avoid the application of US sanctions; and, (c) to evade execution upon the funds by judgment creditors of Cuba. In furtherance of the conspiracy, HSBC and other HSBC subsidiaries falsely and illicitly manipulated the appearance and indicia of ownership to make the funds appear to be the property of HSBC and other HSBC subsidiary banks. The fraudulent manipulation of the identity of ownership for the purpose of concealing the true owners of the funds involved in the "stripped" transactions was the core purpose of the conspiracy. These transactions ultimately came to the attention of the Office of Foreign Assets Control of the United States Department of Treasury, the United States Department of Justice, and the New York County District Attorney's Office. As a result, HSBC and its parent company HSBC Holdings PLC became the subject of an ongoing investigation over a number of years. The investigation led to a criminal information which was filed in the United States District Court for the Eastern District of New York and was culminated by a criminal Information being filed and a Deferred Prosecution Agreement in the case of *United States of America v. HSBC Bank USA, N.A. and HSBC Holdings, plc* (Case No.

WDC 373073870v5

1:12-cr-00763-JG). (*See* Information and Deferred Prosecution Agreement, attached hereto as Exhibits B and C to Levitt Decl. respectively).

On December 11, 2012, in a Deferred Prosecution Agreement between HSBC, HSBC Holdings PLC and the United States, HSBC and HSBC Holdings PLC agreed that it accepted responsibility for the acts described in an attached Statement of Facts ("SOF") and agreed that the facts described in the SOF were true and accurate. (Deferred Prosecution Agreement at Pg. 2, ¶ 2). Among other facts it admitted, HSBC acknowledged that it "altered and routed payment messages in a manner that ensured that payments involving sanctioned countries and entities cleared without difficulty through HSBC Bank USA and other U.S. financial institutions in New York County and elsewhere." (SOF at p. 21-22, ¶ 63). This included payments of approximately $30 million sent through the United States on behalf of Cuba. *Id.*

### B. Garnishee Barclays Bank PLC

Barclay's settlement agreement with the U.S. government shows the following. At least as early as the mid-1980s and continuing through 2006, Garnishee Barclays Bank PLC was involved in ongoing conspiracies with countries that were the target of U.S. sanctions and correspondent banks used by those countries for the purpose of facilitating illicit transactions through the U.S. financial system. One of the sanctioned countries for whom Barclays Bank PLC illicitly processed transactions through U.S. banks was the Republic of Cuba. Following an investigation into Barclays Bank PLC's activities, OFAC identified transactions illegally processed through the United States totaling $6,711,798.95, in violation of the Cuban Assets Control Regulations, 31 C.F.R. § 212.

On December 10, 2012, Barclays Bank PLC entered into a Settlement Agreement with the Office of Foreign Assets Control, for the purpose of resolving the potential civil liability it

faced for violating U.S. sanctions regulations. (*See* Barclays Settlement Agreement, attached as Exhibit D to Levitt Decl.). In the Settlement Agreement, Barclays Bank PLC agreed to pay OFAC $176,000,000. Barclays Bank PLC's illicit conduct, as it related to Cuba, was described in the Settlement Agreement and included the altering of payment messages to conceal the remitting banks to the extent such banks were Cuban entities. *See* Barclays Settlement Agreement, p. 3, ¶ 8 ("This practice resulted in certain instances in which on outgoing payments field 52 (ordering institution) was populated with Barclays' sundry account information, making it appear as though Barclays was the remitting bank.").

### C.    Garnishee JPMorgan Chase Bank, N.A.

The JPMorgan Chase settlement agreement with the U.S. government shows the following. Beginning early in the last decade, Garnishee JPMorgan Chase Bank, N.A. ("JPMC") became knowingly engaged in schemes to illicitly process transactions through the U.S. financial system for the benefit of states that were the subject of U.S. sanctions, including the Republic of Cuba. Following an investigation into JPMC's activities, OFAC identified transactions processed by JPMC through the United States, for the benefit of the Cuban government and Cuban nationals, totaling $178,530,954.27, in violation of the Cuban Assets Control Regulations, 31 C.F.R. § 212.

On August 25, 2011, JPMC entered into a Settlement Agreement with OFAC for the purpose of resolving the potential civil liability it faced for violating U.S. sanctions regulations. (*See* JPMC Settlement Agreement, attached as Exhibit E to Levitt Decl.). In the Settlement Agreement, JPMC agreed to pay OFAC $88,300,000. JPMC's illicit conduct, as it related to Cuba, was described in the Settlement Agreement as follows:

> From on or about December 12, 2005, to on or about March 31, 2006, JPMC processed 1,711 electronic funds transfers in which the Government of Cuba or a

14

Cuban national had an interest, in the aggregate amount of $178,530,954.27, in apparent violation of the prohibition against dealing in property in which Cuba or a Cuban national has an interest, 31 C.F.R. § 515.201.

(JPMC Settlement Agreement, p. 1, ¶ 3).

Even assuming, arguendo, the Garnishee Banks had standing to challenge the consent decree concerning the Phase I Accounts, it would be a manifest injustice to permit them, as willfull violators of U.S. law in order to conduct banking services for Cuba, to now assert that, under *Calderon-Cardona* and *Hausler*, their fraudulent transfers are protected by their status as supposed intermediary banks. As such, the purported ownership interest of an intermediary bank for any blocked transaction during the period of time in which Garnishees HSBC, Barclays Bank PLC, and JPMC were engaged in an illicit banking relationship with Cuba should be set aside or ignored.

## VI. THE GARNISHEE BANKS ARE NOT ENTITLED TO A STAY, WHICH IN THIS CASE IS NOT APPROPRIATE

### A. The Garnishee Banks Have Not Satisfied the Standard for a Stay

Garnishee Banks recite the standard for a stay under Federal Rule of Civil Procedure 62(b)(3), which empowers the Court "on appropriate terms for the opposing party's security . . . may stay the execution of a judgment—or any proceedings to enforce it" pending the disposition of a Fed. R. Civ. P. 59(e) motion for reconsideration. Fed. R. Civ. P. 62(b)(3). In analyzing a stay application, the Court is to consider the movant's likelihood of success, the threat of irreparable harm to either side and the public interest. *Frankel v. ICD Holdings S.A.*, 168 F.R.D. 19, 21 (S.D.N.Y. 1996); *see also Katz v. Feinberg*, No. 99 CIV. 11705 (CSH), 2001 WL 1132018, at *2 (S.D.N.Y. Sept. 24, 2001) (*quoting* general standard applied under Court's inherent authority to enter stay articulated in *Landis v. North American Co.*, 299 U.S. 248, 255 (1936) that party seeking stay "must make out a clear case of hardship or inequity in being

15

required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else."[5]) As with any motion for equitable relief, the Court should also consider whether the applicant comes to the Court with clean hands. *Stone v. Williams*, 891 F.2d 401, 404 (2d Cir. 1989) (*quoting Johanna Farms, Inc. v. Citrus Bowl, Inc.*, 468 F.Supp. 866, 874 (E.D.N.Y.1978) ("one who seeks Equity's assistance must stand before the court with clean hands").

Garnishee Banks cannot satisfy this standard on the merits for the reasons set forth above. Further, there can be no stay for Garnishee Banks that no longer have any legal interest in this dispute. Most notably, they make their application with unclean hands, having indulged Petitioners and the Court in a process which they themselves represented and agreed would occur separate and apart from any ruling in the *Hausler* or *Calderon-Cardona* matters. Now, however, even after no claimant has appeared to contest the Phase I Turnover, the Banks who were presumably neutral stakeholders (although belied by the revelations in the government settlements discussed above), seek to use those two cases to undo what they previously agreed. This duplicity deprives them of any entitlement to equitable remedies they might seek, including a stay. *DeRosa v. National Envelope Corp.*, 595 F.3d 99, 103 (2d Cir.2010)

## B.    Garnishee Banks Are Required to Post a Bond In Any Event

Even assuming the Court was to entertain the stay request, the Garnishee Banks would need to satisfy the requirement of Fed. R. Civ. P. 62(b) relief based on "[o]n appropriate terms for the opposing parties' security. . . ." "The few courts that have interpreted this rule [62(b)] have generally concluded that some security need be posted." *McGrath v. Murgolo*, No. CV 87-

---

[5]    This test is applicable to the Garnishee Banks request for a stay pending determination of the writs of *certiorari* in *Hausler* and *Calderon-Cardona*. *See Katz*, No. 99 CIV. 11705 (CSH), 2001 WL 1132018, at *2-3. Rule 62(b) does not apply to applications of stay pending proceedings in other actions, but the Court still has inherent authority to issue a stay under the traditional principles of standards for issuing a stay that guide the Court's discretion. *Id.*

16

0639 (RJD), 1988 WL 8658, at *1 (E.D.N.Y. Jan. 25, 1988). When there is a risk of irreparable harm to the non-movant, a bond or other form of security to protect the non-movant is mandatory. *See Frankel*, 168 F.R.D. at 22. The required security is generally 110% of the principal amount of the judgment. *See Frankel*, 168 F.R.D. at 22 (requiring that movants post bond at 110% of judgment where they made "no showing that they [were] unable to provide any security" and there was some possibility of irreparable harm to non-moving party); *Katz*, No. 99 CIV. 11705 (CSH), 2001 WL 1132018, at *4 (requiring moving party to post bond at 110% of judgment where ***moving*** party was likely to suffer irreparable harm if stay did not issue).

The terms for a stay the Garnishee Banks have proposed is wholly inadequate. The Banks contend they need post no security and rely on the conclusory assertion that "Petitioners interest in recovering the blocked EFTs is not at risk and the Court should maintain the status quo" pending any application for certiorari that Petitioners might make. (Mov. Mem. at 12-13.) Not only is there no support for this vacant assertion, the facts are to the contrary.

The status quo does not suffice, because of the fluid situation involving Cuba and the possibility that OFAC could issue a license for the funds, making them unavailable to Petitioners. *See U.S. v. All Funds on Deposit with R.J. O'Brien & Associates*, Civ. No. 13-3732 (7th Cir. 2015). In view of the Executive Branch's rapprochement with Cuba, leaving the funds in the accounts as the Garnishee Banks suggest would leave them at risk of political fiat and potentially leave Petitioners without a remedy. This risk is not imagined and there is a real possibility that the Executive Branch could earmark blocked Cuban assets for rebuilding the rehabilitated terrorist nation and out of the reach of terrorism judgment creditors. This is exactly what occurred in 2002, as the Executive Branch did under similar circumstances with Iraq.

17

Exec. Order No. 13290, 68 Fed. Reg. 56, 14307-308 (March 20, 2003). Similarly, as mentioned above, an OFAC license would yield the same result.

Thus, assuming the Court were to entertain a stay (which it should deny out of hand) appropriate security would be either a requirement that the Garnishee Banks deposit the funds in the Phase I Accounts in Court, or that they post a bond in 110% the amount of the funds to be turned over, plus interest.

## CONCLUSION

For all the reasons set forth above, the Garnishee Banks' motion for reconsideration/stay should be denied in all respects and the Banks ordered to turn over the Phase I Accounts forthwith.

18

HALL, LAMB & HALL, P.A.

By: /s/ Andrew C. Hall
Andrew C. Hall, Esq.*
Brandon R. Levitt, Esq.
Grand Bay Plaza, Penthouse One
2665 South Bayshore Drive
Miami, Florida, 33133
Phone: (305) 374-5030
Fax:    (305) 374-5033
* admitted *pro hac vice*

and

Edward H. Rosenthal, Esq.
Beth I. Goldman, Esq.
FRANKFURT KURNIT KLEIN &
SELZ, P.C.
488 Madison Ave, 10th Floor
New York, New York 10022
Phone: (212) 980-0120
Fax:    (212) 593-9175

*Attorneys for Alfredo Villoldo,
individually, and Gustavo E. Villoldo,
individually, and as Administrator,
Executor, and Personal
Representative of the Estate of
Gustavo Villoldo Agrilagos*

KOHN, SWIFT & GRAF, P.C.

/s/ Robert A. Swift
Robert A. Swift
Admitted *Pro Hac Vice*
One South Broad Street, Suite 2100
Philadelphia, Pennsylvania 19107
Phone: 215-238-1700
Fax:    215-238-1968

Jeffrey E. Glen
ANDERSON KILL & OLICK, P.C.
1251 Avenue of the Americas
New York, New York 10020
Phone: 212-278-1000
Fax:    212-278-1733

*Attorneys for Petitioner Aldo Vera, Jr.*

COLSON, HICKS, EIDSON

/s/ Roberto Martinez
Roberto Martinez, Esq.
Admitted *Pro Hac Vice*
255 Alhambra Circle, Penthouse
Coral Gables, Florida, 33134
Phone: (305) 476-7400
Fax: (305) 476-7444

*Attorneys for Petitioners Jeanette Fuller
Hausler, and William Fuller as court-
appointed co-representatives of the Estate of
Robert Otis Fuller, deceased, on behalf of all
beneficiaries of the Estate and the Estate Of
Robert Otis Fuller*

19